# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 17-616V
Filed: October 17, 2022

```
*  *  *  *  *  *  *  *  *  *  *  *  *  *
KESHA M. STORY,                          *        UNPUBLISHED
                                         *
              Petitioner,                *
v.                                       *        Decision on Attorneys' Fees and Costs;
                                         *        Reasonable Basis.
SECRETARY OF HEALTH                      *
AND HUMAN SERVICES,                      *
                                         *
              Respondent.                *
*  *  *  *  *  *  *  *  *  *  *  *  *  *
```

*Frank Lamothe, III, Esq.*, Lamothe Law Firm, New Orleans, for petitioner.
*Darryl Wishard, Esq.*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION ON ATTORNEYS' FEES AND COSTS[1]

**Roth**, Special Master:

On May 9, 2017, Kesha Story ("Ms. Story" or "petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program.[2] Petitioner alleges that she developed transverse myelitis ("TM"), allegedly diagnosed on January 18, 2017, after receiving influenza ("flu") vaccinations on November 3, 2014 and October 4, 2016. Petition ("Pet."), ECF No. 1. Petitioner voluntarily dismissed her claim on July 1, 2019. Dismissal Decision, ECF No. 49. Petitioner now seeks an award of attorneys' fees and costs. Motion for Attorneys' Fees and Costs. ECF No. 53 ("Mot. for Fees").

---

[1] Although this Decision has been formally designated "unpublished," it will nevertheless be posted on the Court of Federal Claims' website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (codified as amended at 44 U.S.C. § 3501 note (2006)). **This means the Decision will be available to anyone with access to the internet.** However, the parties may object to the Decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public. *Id.*

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I. Background

**A.     Summary of Relevant Medical Records**

### 1.   Petitioner's Medical History Prior to the Flu Vaccines

Petitioner's medical history prior to receipt of the allegedly causal influenza ("flu") vaccination was significant for chronic and severe lower back pain, hypothyroidism, lumbar and cervical stenosis, sciatic nerve pain, carpal tunnel syndrome, incontinence, bipolar disorder, agoraphobia, obesity, and diabetes. *See* Petitioner's Exhibit ("Pet. Ex.") 1 at 19; Pet. Ex. 5 at 78, 85, 100; Pet. Ex. 6 at 233; Pet. Ex. 11 at 22, 27; Pet. Ex. 12 at 77. Petitioner also suffered from swelling, numbness, falling, and burning sensations in both legs, as well as episodes of muscle spasms in her biceps, back, and legs. Pet. Ex. 5 at 31, 73, 77, 85-86, 96, 98; Pet. Ex. 11 at 22, 26; Pet. Ex. 15 at 8, 12, 28-29, 33, 93-94.

On November 6, 2013, petitioner presented to Daughters of Charity Health Center and reported neck pain, tingling in her face and tongue, falling a lot, and ringing in her ears. Pet. Ex. 30 at 3. Petitioner felt that her left leg was "getting 'shorter' for the past 1.5 yrs." and complained of bilateral sciatica. *Id.* Petitioner had swollen glands in her neck, stuffiness, and a sore throat. *Id.* The physician assessed petitioner with lumbago, sciatica, and an acute respiratory infection. *Id.* at 4. She was directed to follow up in two weeks if needed. *Id.*

On November 11, 2013, petitioner presented to the emergency department at St. Bernard Parish Hospital ("St. Bernard") with trauma to her left eye—she had been "hit in the eye with a chart at work." Pet. Ex. 12 at 127, 138, 149. No medications were prescribed, and petitioner was directed to follow up with her primary care physician ("PCP" or "Dr. McDermott"). *Id.* at 156. Petitioner returned two days later, on November 13, 2013, complaining of swelling in the left facial area, as well as "pins and needles" in her face. She reported that she had been using erythromycin for her eye. *Id.* at 120, 127. Upon examination, no swelling was observed, and her face appeared equal bilaterally. *Id.* at 122. She was assessed with a potential drug allergy to erythromycin. *Id.* at 138. She was discharged home with a prescription for Vistaril. *Id.*

In April 2014, petitioner presented to the emergency department at St. Bernard with abdominal pain and gastric issues. *See* Pet. Ex. 12 at 103-05. In June of 2014, she was referred for MRIs due to sciatica and "skin sensation disturb [sic]" diagnoses. *Id.* at 77. Petitioner's July 2, 2014 lumbar MRI without contrast showed mild broad-based disc protrusions at L3-L4, L4-L5, and L5-S1. Disc hypertrophy was noted at L3-L4 and L4-L5; neural foramen stenosis was noted at L5-S1. *Id.* at 80. A CT scan of the lumbar spine was performed on July 24, 2014 and showed central canal stenosis at L3-L4. *Id.* at 60.

In July of 2014, petitioner noted to Dr. McDermott she had fallen because she couldn't "feel the floor." Pet. Ex. 5 at 98. Dr. McDermott documented lumbar muscle spasms and right leg swelling progressing over the past two weeks with worsening incontinence. Pet. Ex. 12 at 85.

On October 13, 2014, petitioner presented to Dr. McDermott for a follow-up. Pet. Ex. 5 at 73. Petitioner reported that she "[f]ell so hard that [she] went to [the] ER." Her left thigh numbness

was resolving but her right thigh numbness and nerve related swelling was returning. *Id.*

## 2. Petitioner's Medical History During and After Receipt of the November 3, 2014 Flu Vaccine

On November 3, 2014, petitioner presented to Dr. McDermott with complaints of trouble walking. Pet. Ex. 5 at 70; Pet. Ex. 15 at 5. She reported her legs were "like 'jelly'." Her thigh numbness had resolved but her leg strength was worse. She was tripping more often with walking. She could not stand on one foot without holding onto something for balance. She reported "feeling fuzzy and forgetful in past few weeks." Pet. Ex. 5 at 70; Pet. Ex. 15 at 5. Examination revealed slow, shuffling, antalgic gait. Pet. Ex. 5 at 71; Pet. Ex. 15 at 6. Diagnoses were listed as hypothyroidism, lumbosacral spinal stenosis, a herniated disc at L3-L4, sciatica, bilateral leg weakness, and numbness of the face. A concern for multiple sclerosis ("MS") was noted; an MRI with and without contrast of the head and the cervical spine were planned but needed to be authorized by petitioner's insurance. A consultation with a physical therapist was also recommended. Pet. Ex. 5 at 71; Pet. Ex. 15 at 6.

Petitioner received the first subject flu vaccine on November 3, 2014. Pet. Ex. 5 at 71; Pet. Ex. 15 at 6.

The next day, November 4, 2014, petitioner presented to St. Bernard for recommended physical therapy evaluation. Pet. Ex. 12 at 20. She reported chronic lower back pain which had gotten worse over the past four months, as well as progressive lower extremity weakness. *Id.* She reported having had increased edema in her right leg with decreased sensation which had resolved. *Id.* She reported nine falls in the past year due to lower leg weakness and difficulty navigating stairs; she felt like her left leg was shorter than her right. *Id.* It was noted that petitioner was only able to tolerate about four minutes of ambulation before needing to rest due to lower extremity weakness. *Id.* She was prescribed physical therapy two times a week for six weeks. *Id.* at 13.

On November 17, 2014, petitioner presented to University Medical Center for acute incontinence after an epidural steroid injection and intermittent but significant facial numbness. Pet. Ex. 11 at 10. Her incontinence had resolved spontaneously. *Id.* A neurologic exam was normal; an MRI and lumbar spine CT were unremarkable. *Id.* Petitioner was referred to the neurology clinic. *Id.*

On November 27, 2014, petitioner was seen by a neurosurgeon for two weeks of facial numbness. Pet. Ex. 5 at 72. There was a concern for MS and a brain MRI was ordered. *Id.*

A brain MRI was performed on December 9, 2014 and no abnormalities were noted. Pet. Ex. 12 at 8. A cervical spine MRI was also performed and showed mild discogenic disease but no significant central canal or foraminal stenosis and no mass or enhancement. *Id.* at 9.

On December 15, 2014, petitioner had a follow-up for facial numbness and chronic pain. Pet. Ex. 11 at 14. During this visit, she reported facial numbness and arm/shoulder pain but no neurologic deficits. *Id.* at 16. She denied any new symptoms or recurrence of bladder incontinence. *Id.* Petitioner's recent MRIs were normal. *Id.*

On December 16, 2014, petitioner had a follow-up with Dr. McDermott for five weeks of facial numbness in both cheeks and her tongue and continued lower back pain. Pet. Ex. 5 at 67; Pet. Ex. 15 at 2–3. Her mental confusion had improved since her last appointment. *Id*. She reported that she saw a neurosurgeon "yesterday" who felt that MS was the best explanation for her symptoms.[3] *Id*. Physical therapy was helping with her leg strength but was making her lower back and neck pain worse. *Id*. She complained of fatigue and increased sleep issues. *Id*. She was referred to a neurologist for further evaluation. *Id*. at 68.

Petitioner returned to Dr. McDermott on January 19, 2015 for dizziness and pain and swelling of her right shoulder. Pet. Ex. 5 at 64. She reported mental fog in the morning that wore off by midday. *Id*. She reported right shoulder and neck pain and swelling on and off for two months. *Id*. She requested a refill of Norco, which was ordered. *Id*. at 64–65. Upon examination, she had right upper shoulder muscle hypertrophy posteriorly over the trapezius. *Id*. at 65. Her referral to a neurologist was still pending. *Id*. A lumbar puncture ("LP") was ordered. *Id*. A note added on February 9, 2015 stated that the physical therapist reported that petitioner had not attended PT since December 2, 2014. *Id*. at 66.

On February 11, 2015, petitioner returned to Dr. McDermott for a follow-up after an emergency room visit for a salivary duct stone. Pet. Ex. 5 at 58. She reported right-sided facial pain "since yesterday," went to the ER, and was diagnosed with a salivary duct stone. *Id*. At the ER, she had a fever of 101.5 degrees and was given penicillin; she had not had a fever for the past 24 hours but was "still having a lot of pain and swelling." *Id*. Petitioner further reported that she had a lumbar puncture that day as part of a work-up for MS. *Id*. Petitioner was referred to an ENT with an appointment made for Friday, February 13.[4] *Id*. at 61.

Petitioner returned to Dr. McDermott on February 18, 2015 for follow-up of her salivary duct stone. Pet. Ex. 5 at 58. She reported having gone to the ENT the week before; he restarted her antibiotics and ordered a repeat head CT. *Id*. She was "feeling better than last week." *Id*. She reported that she was restarting PT that week and requested that her pain medications be changed to a lower dose with increased frequency. *Id*. Examination revealed that her right-sided facial swelling had resolved but she was "still talking with a bit of 'cotton mouth.'" *Id*. at 59.

On March 18, 2015, petitioner presented to Dr. McDermott for a follow-up of bilateral facial numbness and right-sided leg pain and numbness. Pet. Ex. 5 at 55. She reported a rash on her inner left ankle which appeared two weeks before. *Id*. A lumbar puncture showed oligoclonal bands, but a brain MRI was normal. *Id*. at 57. Petitioner had an appointment with a neurologist at LSU scheduled for March 30. *Id*.

On March 30, 2015, petitioner presented to Dr. Khursheed, a neurologist at LSU, for "[n]umbness of the face and finger tips x 6 months, hands numbness x many years." Pet. Ex. 7 at 13. Petitioner reported lower back pain that radiated down her leg. *Id*. She had a lumbar epidural steroid injection in July 2014 "after which she became incontinent for 2 weeks which has since resolved." *Id*. She did not have any current bladder or bowel problems. *Id*. Motor and sensory examinations were normal. *Id*. at 14-15. Dr. Khursheed reviewed petitioner's past testing and noted

---

[3] Though petitioner reported "yesterday", the neurology visit was on November 27, 2014.
[4] While the appointment was made, no record was filed for this visit.

that MRIs of the brain and cervical spine were "[c]ompletely normal" and an MRI of the lumbar spine showed no evidence of tethered cord. *Id*. at 16. Dr. Khursheed further noted that a lumbar puncture was done and showed no oligoclonal bands. *Id*. Under "Assessment," Dr. Khursheed wrote, "No suspicion for multiple sclerosis which is completely ruled out. Symptoms likely psychogenic in origin. We will however check some rare metabolic causes of myelopathy due to her generalized hyperreflexia which is unlikely to be pathologic." *Id*. He recommended testing for vitamin B12, folate, vitamin E, and copper levels, as well as a psychiatric follow-up. *Id*.

On April 6, 2015, petitioner telephoned Dr. Khursheed, but no notes of the telephone call were made. Pet. Ex. 7 at 21-22.

Petitioner returned to Dr. McDermott for a well visit on April 23, 2015. Pet. Ex. 5 at 51. She requested a Norco refill and referral for a mammogram. *Id*. Petitioner reported she "feels that she didn't get a good eval (sic)[at her follow up at LSU]. They focused on anxiety as a source of her symptoms, however [they] have referred her for EMG for eval (sic) of carpal tunnel." *Id*. Petitioner reported the neurologist "mentioned that [a] nerve root disorder that isn't related to compression might also be causing the paresthesias." *Id*.  She had not tried gabapentin for tingling. *Id*. She was doing water aerobics five day per week which "feels really good." *Id*. Her diagnoses were listed as facial numbness and thigh numbness, lumbar spinal stenosis, severe agoraphobia and bipolar disorder with stable symptoms, hypothyroidism, morbid obesity, and a right salivary duct obstruction which had resolved. *Id*. at 53. A mammogram and thyroid hormone level testing were ordered. *Id*. Petitioner was prescribed gabapentin. *Id*.

Petitioner presented to Dr. Rogers at the LSU EMG Laboratory on June 15, 2015, with a history of carpal tunnel syndrome in both arms diagnosed more than ten years ago. Pet. Ex. 7 at 30. She had release surgery on the left side but not the right. *Id*. She was having increased paresthesias in the fourth and fifth fingers of both hands at night. *Id*.  An EMG/NCS was consistent with mild carpal tunnel syndrome on the left and moderate on the right but no evidence of ulnar neuropathy. *Id*. at 33.

Petitioner returned to Dr. McDermott on July 2, 2015 for evaluation for weight loss surgery and a refill of Norco. Pet. Ex. 16 at 66. She brought "a packet of paper that shows PCP (sic) has to supervise medical weight loss program for 6 [months]." *Id*. Dr. McDermott noted that petitioner would obtain mental health clearance from her psychiatrist. *Id*. The assessment was primary snoring, dysmetabolic syndrome X, morbid obesity, and lumbosacral spinal stenosis. *Id*. Petitioner was referred to "Advanced neuro (sic) for pain from sciatica" and her prescription for Norco was renewed. *Id*. at 67.

Petitioner presented to Dr. Shamsnia at Advanced Neurodiagnostic Center on August 24, 2015 for neurologic evaluation and management of chronic pain. Pet. Ex. 9 at 47. She provided a history of hypothyroidism, asthma, gall bladder surgery, hysterectomy, and bilateral carpal tunnel syndrome. *Id*. She was borderline diabetic with a history of insomnia and depression. *Id*. Petitioner reported lower back pain which "started about 3 years ago gradually, with her job involving a lot of bending and physical labor. [It] is associated with radiating pain symptoms down the right leg." *Id*. Her neck pain started one year ago after a fall and radiated down her bilateral upper extremities. *Id*. Petitioner reported two epidural spinal injections which caused temporary urinary incontinence.

*Id*. Upon examination, petitioner was noted to have cervicalgia and chronic lower back pain with "some cervical muscle spasm." *Id*. at 48. She exhibited polyneuropathy, "most probably diabetic polyneuropathy," and carpal tunnel syndrome. *Id*. Dr. Shamsnia prescribed several assistive devices, including cock-up wrist splints, a cervical pillow, and traction device. *Id*. at 49. An EMG of the lower extremities was ordered to evaluate for lumbar radiculopathy and polyneuropathy. *Id*. Norco was discontinued, and oxycodone was prescribed instead. *Id*. Petitioner was recommended to return in two to three months for a follow-up. *Id*. Petitioner self-recorded "blurred vision" and "double vision" though Dr. Shamsnia's assessment of visual fields for both eyes were normal. Dr. Shamsnia did not test for visual acuity or other concerns for petitioner's eyesight. Petitioner did not indicate "loss of vision." *See* Pet. Ex. 16 at 55-60; *id.* at 48.

On September 23, 2015, petitioner presented to Dr. McDermott for fluid in both ears. Pet. Ex. 5 at 33. She reported congestion which was not helped with Allegra-D, as well as snoring and shortness of breath when walking, which was attributed to baseline deconditioning. *Id*. at 35. She reported her "[w]hole house has pinworms" and she "[w]as told to come to MD for rx (sic)." *Id*. Examination revealed serious effusion in both tympanic membranes and posterior pharynx with clear postnasal drip. *Id*. Dr. McDermott's assessment was allergic rhinitis, hypothyroidism, exposure to enterobius vermicularis, chronic pain, anxiety, and metabolic syndrome X. *Id*. at 36. Petitioner was prescribed fluticasone nasal spray and Pin-X tablets. *Id*.

An EMG of both lower extremities on October 13, 2015 showed right posterior tibial neuropathy and right S1 radiculopathy. Pet. Ex. 9 at 36-42; Pet. Ex. 16 at 40-46.

On November 1, 2015, petitioner presented to the emergency department at Touro Infirmary Hospital with nausea, vomiting, and headache with right temporal and temple pain. Pet. Ex. 6 at 230, 233. She was negative for "fever, vision changes, memory problems…" *Id*. at 233. Head CT was negative. *Id*. at 234, 237. She was administered ondansetron, ketorolac, and acetaminophen and then discharged. *Id*. at 234-35.

Petitioner returned to Dr. McDermott on November 10, 2015 for sweating, pain on her right side, and constant vomiting. Pet. Ex. 5 at 31. She reported being "[n]auseated for a few weeks with meals" which felt like her previous cholecystitis, but her gall bladder had since been removed. *Id*. at 32. She also had a burning sensation in her right upper quadrant for one week and emesis for three weeks. *Id*. She "went to Touro last week and was told she was having nausea from migraine." *Id*. She tried Prilosec OTC which helped with belching but not nausea. *Id*. Dr. McDermott noted a concern for hepatic steatosis. *Id*. A proton-pump inhibitor was recommended along with a bland diet. *Id*.

Petitioner presented to Dr. Prasad at Advanced Neurodiagnostic Center on November 19, 2015, with obstructive sleep apnea, bilateral carpal tunnel syndrome, and chronic pain. Pet. Ex. 9 at 32, 34; *see also* Pet. Ex. 16 at 38-39. She reported headache on November 1, 2015 which "even included some brief vision loss.[5]" Pet. Ex. 9 at 33. Dr. Prasad noted that her family history is "quite significant for headaches, and in fact, 2 sisters were found to have headaches related to cerebral aneurysmal findings." *Id.* Upon exam, she had an even tandem gait. *Id*. at 34. An MRA of the brain

---

[5] The ER records from November 1, 2015 specifically documented no visual or vision changes. Pet. Ex. 6 at 233.

and a repeat sleep study were ordered. *Id.*

On November 24, 2015, petitioner presented to Dr. McDermott for shortness of breath and a productive cough for 10 days. Pet. Ex. 5 at 28, 30. She reported a fever of 101 "last week" but had not had a fever for the past three days. *Id.* She had shortness of breath when walking and lying down, coughing and wheezing. *Id.* Examination revealed swollen lymph nodes, decreased breath sounds, and wheezing. *Id.* The assessment was exacerbation of asthma, likely triggered by a viral upper respiratory infection, improving. *Id.* Petitioner was prescribed a Symbicort inhaler and azithromycin. *Id.*

An MR angiogram performed on December 23, 2015 was normal. Pet. Ex. 8 at 28; Pet. Ex. 9 at 28; Pet. Ex. 14 at 27, 30; Pet. Ex. 16 at 32. Blurred vision was noted on the record, but no details were provided. No vision loss was reported Pet. Ex. 8 at 28.

Petitioner presented to Dr. Prasad at Advanced Neurodiagnostic Center on February 18, 2016 for constipation due to medication. Pet. Ex. 9 at 18. She reported right pelvic pain and right leg pain for about three weeks. *Id.* She was prescribed magnesium and Lactulose. *Id.* at 19. A sleep study was ordered again, as it had not been scheduled. *Id.* at 19–20. A urine sample was positive for opiates and oxycodone. *Id.* at 20.

A sleep study performed on March 16, 2016 confirmed obstructive sleep apnea. Pet. Ex. 9 at 16–17. A nasal PAP was recommended. *Id.*

Petitioner returned to Dr. Prasad at Advanced Neurodiagnostic Center on May 2, 2016 with increased pain from carpal tunnel syndrome, increased anxiety, and numbness and pain. Pet. Ex. 9 at 5–6; *see also* Pet. Ex. 16 at 20–21. An EMG of the upper extremities was ordered to reevaluate petitioner's carpal tunnel syndrome. *Id.* at 6. Surgical release was recommended. *Id.*

On May 13, 2016, petitioner presented to Dr. McDermott with a swollen left arm. Pet. Ex. 5 at 25. She had not been seen for six months. *Id.* at 27. Petitioner reported increase palpitations occurring three to four times per day, associated with shortness of breath. *Id.* The palpitations went away on their own and the shortness of breath improved as soon as the palpitations resolved. *Id.* Petitioner further reported that her left arm was swelling more in the past three to four months; the swelling "comes and goes" and sometimes petitioner could not bend her elbow. *Id.* Upon exam, Dr. McDermott noted petitioner's left arm did not appear swollen when compared to her right arm. *Id.*

On July 3, 2016, petitioner presented to Touro Infirmary Hospital with difficulty breathing. Pet. Ex. 6 at 181. She reported a sore throat for six days and asthma exacerbation for the last four hours with no relief from home medications. *Id.* She had a history of asthma and uvulitis. *Id.* at 186. Upon examination, her respiration was even but labored, and her breath sounds were diminished in both posterior lower lobes. *Id.* at 182. A rapid strep test was negative, and a chest x-ray was clear. *Id.* at 190, 195. She was administered solumedrol, albuterol, diphenhydramine, and Rocephin. *Id.* at 188. Her discharge diagnoses were pharyngitis, upper respiratory infection, and bronchitis, and she was prescribed amoxicillin, prednisone, and ipratropium bromide. *Id.*

Petitioner returned to Dr. Prasad at Advanced Neurodiagnostic Center on July 25, 2016, with bilateral hip pain, dizziness, headache, double vision, and vertigo. Pet. Ex. 9 at 8. She reported three weeks of streptococcal pharyngitis and pneumonia, with worsening headaches. *Id*. About five days after the infection started, she developed sudden left-sided paresis, from her face to her leg, which lasted about nine days but was resolving. *Id*. She also had bladder and bowel incontinence for about five days. *Id*. Dr. Prasad noted slurred speech, and she described cardiac dysrhythmia symptoms. *Id*. Dr. Prasad further noted:

> From history and exam, the patient clearly has apparently suffered a cerebrovascular accident (CVA)/stroke. This most probably was a lacunar stroke in the deep cerebral white matter…It is not clear why the patient has suffered this lacunar stroke, but it could be due to her obesity, hypothyroidism, and multiple other medical problems. The patient has obstructive sleep apnea (OSA), which is also a risk factor for developing strokes.

Pet. Ex. 9 at 9. Dr. Prasad prescribed aspirin and Plavix. *Id*. at 10. He noted that petitioner's stroke could also be due to possible cardiac dysrhythmia and recommended she follow up with her primary care physician or a cardiologist. *Id*.

Law enforcement brought petitioner to the emergency room at East Jefferson General Hospital on August 24, 2016 after making homicidal threats in front of police officers. Pet. Ex. 8 at 52, 54-55. At the time of her examination, petitioner was cooperative and had bilateral symmetric non-focal sensory loss. *Id*. at 55. She was diagnosed with depression with homicidal ideation and transferred to a psychiatric facility. *Id*.

### 3. Petitioner's Medical History After the October 4, 2016 Flu Vaccine

Petitioner presented to Dr. McDermott on October 4, 2016 for a follow-up. Pet. Ex. 5 at 19. Since her last appointment four months before, she had two "mini-strokes" with left-sided weakness and facial droop. *Id*. at 21. The neurologist had prescribed an antiplatelet agent and she had moved to an assisted living center. *Id*. She walked with a cane and reported continued left hip pain. *Id*. at 21-22. Examination of her left hip was normal. *Id*. Her diagnoses were listed as weakness as late effect of stroke, body mass index greater than 40, sciatica, and intermittent asthma. *Id*. She was received the subject flu and Tdap vaccinations. *Id*.

Petitioner presented to Dr. McDermott on October 18, 2016 for a well visit. Pet. Ex. 5 at 18. She reported walking more, drinking more water, and eating better. *Id*. She had a breast biopsy for suspected fibroadenoma. *Id*. She reported wheezing with exercise, better with an inhaler. *Id*. She had no fever, chest pain, shortness of breath with walking, abdominal pain, or vomiting. *Id*. She walked with a cane. *Id*. Her diagnoses were listed as hyperlipidemia, hypothyroidism, metabolic syndrome X, and mild persistent asthma. *Id*. at 19.

Petitioner returned to Dr. McDermott on December 23, 2016 with ocular migraine symptoms for eight days, with associated nausea and emesis for one day. Pet. Ex. 5 at 14. She also had right-sided facial throbbing and pain over her right temple. *Id*. A neurology appointment was scheduled for April at LSU. *Id*. She used a walker for stability and continued to have left-sided

weakness from her stroke. *Id*. at 14–15. She was prescribed butalbital-acetaminophen-caffeine and tizanidine for her headaches and referred to a neurologist. *Id*. She was referred to an orthopedist for her lumbar spinal stenosis. *Id*.

On January 18, 2017, petitioner was transferred from St. Bernard to Tulane Medical Center with complaints of lower extremity weakness, numbness and tingling from her buttocks to her toes, and urinary retention. Pet. Ex. 1 at 678. The record documents the following:

> Pt reports that she was in her normal state of health until Friday, when she started experiencing stumbling and ataxia. Her ataxia worsened over the weekend, and on Sunday, she started noticing numbness around her groin and rectal region. On Sunday afternoon, the pt noticed that she had to hold onto objects to walk as she could not walk without support. At one point on Sunday evening pt fell on the kitchen floor and lost consciousness…. Her landlady found her passed out, covered in urine and stool on Monday. Since that point on, pt complains of urinary retention and inability to void. She reports that she suffers from PCOS, hypothyroidism and spinal stenosis. She has been diagnosed with possible cervical stenosis and was undergoing pain management therapy under the care of Dr. Shamsnia before. She complains of lower back pain as well. However, she has never suffered from this kind of episode before. Prior to this event, she was able to perform all her ADLs without assistance. However, now she is unable to walk without support of a cane.[6]

Pet Ex. 1 at 678. Petitioner was admitted to the ICU and MRIs of the brain, cervical spine, thoracic spine, and lumbar spine were ordered. *Id*. at 681-82. The brain MRI showed no abnormalities, but the cervical spine MRI showed scattered regions of increased T2 signal intensity throughout the cervical cord which was concerning for a demyelinating inflammatory process such as multiple sclerosis. *Id*. at 694, 772-75. Petitioner was treated with steroids for five days. *Id.* at 203.

Petitioner was discharged on January 24, 2017 with a diagnosis of transverse myelitis, possibly secondary to neuromyelitis optica ("NMO"). Pet. Ex. 1 at 202. Medical conditions included hypothyroidism, cervical stenosis with history of lumbar spine stenosis, history of ocular migraines, bipolar disorder, major depression, morbid obesity, history of PCOS, asthma/sleep apnea, prediabetes, history of stroke and chronic lower back pain. *Id.* at 202. The teaching physician clarified that petitioner needed to follow up for NMO antibody and MS testing. *Id.* at 677. NMO antibody testing was negative. *Id.* at 42, 203.

On February 9, 2017, petitioner presented to Dr. McDermott with chief complaints of new left sciatica and transverse myelitis. Pet. Ex. 10 at 6. She reported fatigue, blurred vision with red eye, nausea, back pain, neck pain, joint pain, headache, anxiety, and recurring infections. *Id.* Upon exam, her gait was moderately antalgic, and she walked with a cane; she had tenderness and muscle spasm on the left side. *Id*. at 8. She was prescribed oxycodone and methadone. *Id*.

Petitioner was admitted to Tulane Medical Center on February 27, 2017 for increasing

---

[6] As indicated by Dr. McDermott's documentation in October 2016, petitioner was regularly using a cane prior to her episode of passing out on the kitchen floor in January 2017.

weakness of her upper and lower extremities. *See* Pet. Ex. 1 at 22. Though the diagnosis on admission was documented as transverse myelitis, the teaching physician noted that petitioner presented with "neurologic symptoms of unclear etiology. She was previously given the working diagnosis of transverse myelitis, but it is not clear that this is truly her issue. She is being seen by Neurology" *Id.* at 28, 41. At the neurology consult, petitioner reported weakness of the bilateral and upper and lower extremities, as well as imbalance, incontinence, vision changes including blindness for twenty minutes in her right eye, gum pain, and diffuse myalgias. *Id.* at 42–43. Petitioner's medical history included, "Transverse myelitis? MS?," hypothyroidism, PCOS, bipolar disorder, ocular migraine, spinal stenosis, chronic back pain, obstructive sleep apnea, and transient ischemic attack ("TIA"). *Id.* at 43. The neurologist's assessment was possible transverse myelitis versus multiple sclerosis and petitioner's NMO antibody test returned negative. *Id.* at 53.

By March 1, 2017, petitioner's symptoms had improved with steroids. Pet. Ex. 1 at 61. Neurology characterized petitioner's January 2017 admission as "a demyelinating process on MRI C-spine" without a concrete diagnosis. They recommended a full MS work up and an LP to further evaluate any demyelinating process. *Id.* at 65–66. The teaching physician documented petitioner "has presented to several institutions with similar complaints without any objective finding on imaging, bloodwork, or CSF." *Id.* Petitioner was discharged that day with a diagnosis of "Transverse myelitis vs. multiple sclerosis" with further workup for possible MS needed. *See id.* at 19. The teaching physician wrote, "neurologic symptoms of uncertain etiology. She may have transverse myelitis or multiple sclerosis." *Id.* at 21.

On March 9, 2017, petitioner presented for follow-up for left sciatica and became "very irate" with the receptionist and office manager. It was noted that petitioner walked in and out of the clinic without limp. Pet. Ex. 10 at 2–4.

Petitioner presented on March 21, 2017, with a history of hypothyroidism, chronic depression, bipolar disorder, anxiety, apnea, chronic pain, left-sided weakness secondary to stroke, allergic rhinitis, intermittent asthma, neck pain, lumbar spinal stenosis, an abnormal mammogram and severe obesity. Pet. Ex. 5 at 6. She reported a recent hospitalization for TM which she felt was related to the flu shot. *Id.* at 11. She reported sometimes needing a walker or a wheelchair. *Id.*

Petitioner presented to Dr. Frieberg at Tulane Medical Center on March 29, 2017, for neurology follow up. Pet. Ex. 13 at 95. She reported shooting pain from her neck with flexion, difficulty finding words, concentration and memory issues, and a narrowed visual field. *Id.* at 95–97; Pet. Ex. 22 at 8. Examination revealed poor balance, but sensation was intact including to vibration. There was L5 loss on the right. Pet. Ex. 13 at 97; Pet. Ex. 22 at 8. Dr. Frieberg reviewed the MRI with T2 hyperintensity having an official read of demyelination writing he was unimpressed, it "could even represent artifact of movement." He noted the contrasted brain study was "stone cold normal." Pet. Ex. 13 at 97; Pet. Ex. 22 at 8. Dr. Frieberg opined that the demyelinating process in the C-spine was questionable, and the symptoms did not seem consistent with MS. *Id.* He ordered a lumbar puncture and testing for ANA, ESR, CRP, and ACE lever. Pet. Ex. 13 at 97–98. Lyme disease was to be considered as well. Pet. Ex. 13 at 98; Pet. Ex. 22 at 9.

A fluoroscopy-guided LP was attempted on April 12, 2017 but was unsuccessful. Petitioner complained of headaches. Pet. Ex. 13 at 9–11, 63.

MRIs of petitioner's lumbar and cervical spine with and without contrast were done on April 25, 2017. *See* Pet. Ex. 23. MRI of the lumbar spine showed mild degree bilateral facet joint arthropathy at L3-4, L4-5, and L5-S1. *Id.* at 4. MRI of the cervical spine showed broad based disc herniation causing compression at C3-4, C4-5, C5-6, and C6-7, with mild to moderate intervertebral foramen present and some compression on the left C7 nerve root. *Id.* at 6. Both the cervical and lumbar spinal canal were noted to be small on a congenital basis. *Id.* at 4, 6. There was no evidence of abnormal signal intensity. *See id.* at 4-6.

Another lumbar puncture was conducted on May 26, 2017 revealing positive NMO antibody. Pet. Ex. 24 at 36. Petitioner did not return to Dr. Frieberg after this testing was completed.

There were no records filed for medical care between May 26, 2017 and November 15, 2017.

On November 15, 2017, petitioner presented to Dr. Crabtree for MS. Pet. Ex. 25 at 126. Petitioner reported:

> In 2015, following a flu vaccine she developed hiccoughs, tingling in her tongue, burning in her legs, and urinary incontinence. Her symptoms improved when she took steroids for her asthma. She later was told she had transverse myelitis. In 2016 following a flu shot, she developed hiccoughs, CP, and dec[reased] vision in her right eye associated with retro-orbital pain. She also had widespread hypersensitivity of her skin at that time. In 2017, following pneumovax, her pain increased and she developed bowel and bladder incontinence. She reports receiving steroids 1/2017, 3/2017, and 10/2017[;] 5d, 3d, and 5d respectively [of] 1g IV solumedrol. She currently uses a walker due to pain and weakness in her legs. On neuro ROS, she reports cognitive impairment in terms of processing speed and word retrieval. She also reports decreased hearing.

Pet. Ex. 25 at 126. Following a neurological examination, Dr. Crabtree assessed petitioner with NMO. *Id.* at 127. An NMO antibody test was not noted.

Petitioner returned to Dr. Crabtree on December 1, 2017 for NMO-spectrum disorder ("NMO-SD"). Pet. Ex. 25 at 123. She reported improved energy and cognition since stopping Topamax and that gabapentin helped with leg pain, though not completely. *Id.* She reported bladder urgency and frequency. *Id.* Dr. Crabtree ordered a rituximab infusion for petitioner's NMO and bladder medication due to post-void residual of 168cc. *Id.* at 123–124; *see id.* at 81.

On December 20, 2017, Dr. Crabtree's staff noted that petitioner became "irate" with staff, advising that if a prescription for Percocet was not written that day, she would purchase illegal drugs. Pet. Ex. 25 at 118.

Medical necessity for a wheelchair was noted January 10, 2018. Pet. Ex. 25 at 8.

When petitioner returned to Dr. Crabtree on February 28, 2018, she reported having been placed under emergency psychiatric hold due to her use of threatening language and resisting

arrest. She was physically restrained. Pet. Ex. 25 at 110. Billing records show that this occurred on January 24, 2018. Pet. Ex. 26 at 51. Petitioner reported receiving three shots of Haldol, Ativan, and Benadryl. Pet. Ex. 25 at 110. Over the next several days, she reported developing double vision, bladder incontinence, and weakness in both legs, consistent with an NMO relapse. *Id.*

At her March 15, 2018 visit with Dr. Crabtree, petitioner reported that her vision had improved but her pain and cognition were challenging. Pet. Ex. 25 at 101. Dr. Crabtree prescribed intravenous rituximab for NMO. *Id.* at 102.

On April 20, 2018, petitioner presented status-post partial myelitis with "NMO-IgG+ (3.4)." Pet. Ex. 25 at 87. Petitioner had been approved for rituximab infusion and was awaiting treatment. *Id.* Dr. Crabtree assessed petitioner with a spinal cord pathology on the left and NMO-SD. *Id.* Dr. Crabtree additionally noted neurogenic bladder and gait disturbance. *Id.* at 88.

**B.    Procedural History**

Petitioner filed her petition and several medical records on May 9, 2017. Pet., ECF No. 1; Pet. Ex. 1-10, ECF Nos. 4-5. This case was assigned to me on May 10, 2017. ECF No. 6. Petitioner filed additional records and a Statement of Completion in May and June 2017. Pet. Ex. 11-16, ECF Nos. 8, 10-13. Frank Lamothe, a different attorney from the same firm, substituted in place of petitioner's previous counsel of record, Michelle Cumberland, on November 28, 2017. ECF No. 16.

Respondent filed a status report on December 15, 2017 identifying several outstanding medical records, including petitioner's pre-vaccination records for the three years prior to her receipt of the allegedly causal flu vaccination and records for multiple hospitalizations. ECF No. 17. Petitioner was ordered to file the requested records by February 13, 2018, and she updated medical records on December 27, 2017 and January 9, 2018. Pet. Ex. 17-22, ECF Nos. 18, 21-22.

Respondent filed his Rule 4(c) Report on March 16, 2018, stating petitioner had not yet proven that she actually suffered from TM. ECF No. 25 ("Resp. Rpt."). Specifically, respondent noted that TM was not mentioned in any of her medical records until January 2017, and when it was mentioned, it was based on "questionable MRI imaging." *Id.* at 9 (citing Pet. Ex. 13 at 97). Respondent indicated that it seemed additional imaging had been ordered but petitioner had neglected to file these records. *Id.* Respondent also highlighted the fact that one of petitioner's treating neurologists, Dr. Samenia, opined that petitioner symptoms "could be explained by her well-known spinal condition and possible diabetic neuropathy." *Id.* (citing Pet. Ex. 9 at 28). Finally, respondent argued that petitioner failed to offer any evidence that the onset of her symptoms either two years or three months after her flu vaccines was a medically appropriate timeframe for onset of TM following a flu vaccination. *Id.* at 10.

Respondent further identified several additional outstanding medical records which petitioner was ordered to file by May 14, 2018. *See* Resp. Rpt.; Scheduling Order, ECF No. 26. Specifically, petitioner was ordered to file all records related to her diagnosis or treatment of streptococcal pharyngitis, pneumonia, and/or stroke. Scheduling Order at 1, ECF No. 26. Petitioner filed medical records in April and May 2018. *See* Pet. Ex. 23-25, ECF Nos. 27-29. On June 13,

2018, petitioner filed a response to respondent's Rule 4(c) Report in which she cited several references related to her diagnosis and treatment of streptococcal pharyngitis, pneumonia, and/or stroke and her treatment at Tulane facilities. *See* ECF No. 31. Respondent was ordered to file a status report indicating whether he believed the record was complete by July 23, 2018. Non-PDF Scheduling Order, June 14, 2018.

A status conference was held on July 31, 2018, after which petitioner was ordered to file her complete Medicaid ledger and respondent was ordered to file a status report identifying all records believed to be outstanding. Order, ECF No. 33. Petitioner filed her Medicaid ledger on July 31, 2018, and additional records in August and September 2018. Pet. Ex. 26-31, ECF Nos. 34, 36-77. On September 14, 2018, respondent filed a status report identifying approximately fifteen outstanding items necessary to complete his review of this case. ECF No. 38. Petitioner was ordered to file these records by November 16, 2018. Non-PDF Scheduling Order, Sept. 17, 2018.

After an extension of time and a government shutdown, petitioner filed updated medical records over the following three months. Pet. Ex. 32-53, ECF Nos. 41-44. Respondent was ordered to file a status report identifying any further outstanding records and indicating how he intended to proceed. Non-PDF Scheduling Order, Jan. 31, 2019. Following an extension of time, respondent filed a status report on May 1, 2019, advising that he had reviewed the records and determined that he would continue to defend the claim. ECF No. 46. He requested that deadlines be set for the filing of expert reports. *Id.* On the same date, the Court issued an order directing petitioner to file an expert report by July 1, 2019 that addressed her medical conditions prior and subsequent to her vaccination, clarifying what injuries were caused by the vaccine. Order, ECF No. 47. On July 1, 2019, petitioner filed a Motion to Dismiss. ECF No. 28. A dismissal decision was issued on July 3, 2019. Dismissal Decision, ECF No. 49.

On September 24, 2019, petitioner filed the instant Motion for Attorneys' Fees and Costs ("Mot. for Fees"), requesting $19,554.50 in attorneys' fees and $10,308.87 in costs, for a total of $29,863.37. Mot. for Fees, ECF No. 53. Respondent filed a response on October 8, 2019, in which he "defer[red] to the Court as to whether petitioner has presented sufficient evidence establishing that the 'petition was brought in good faith and there was a reasonable basis for the claims for which the petition was brought.'" Response at 2, ECF No. 54.

On October 29, 2020, respondent was ordered to specifically address reasonable basis. Scheduling Order, ECF No. 55. After an extension of time, respondent filed a second response to petitioner's Motion for Fees and Costs on November 20, 2020, arguing that "objective evidence does not establish that petitioner's case was supported by a reasonable basis at any time." Response at 11, 13; ECF No. 57. Respondent did not assert that petitioner's claim was brought in bad faith. *Id.* at 10.

Following an extension of time, petitioner filed a reply on January 8, 2021, arguing that "the reasonable basis for bringing the Petitioner's claim becomes clear when one focuses on the *new* symptoms which Petitioner began to exhibit after receipt of the 2014 and 2016 vaccines." Reply at 8-9, ECF No. 59.

Adjudication of petitioner's Motion was deferred while the Federal Circuit considered the factors contributing to an analysis of reasonable basis. The Federal Circuit provided additional guidance in *Cottingham ex. rel. K.C. v. Secretary of Health and Human Services*, 971 F.3d 1337 (Fed. Cir. 2020), and issued another decision regarding the reasonable basis standard in *James-Cornelius v. Secretary of Health and Human Services*, 984 F.3d 1374 (Fed. Cir. 2021).

This matter is now ripe for determination.

## II. Legal Standard

The Vaccine Act permits an award of "reasonable attorneys' fees" and "other costs." § 15(e)(1). If a petition results in compensation, petitioner is entitled to reasonable attorneys' fees and costs. *Id.*; *see Sebelius v. Cloer*, 133 S. Ct. 1886, 1891 (2013). Where a petitioner does not prevail on entitlement, a special master has discretion to award reasonable fees if the petition was brought in "good faith" and with a "reasonable basis" for the claim to proceed. § 15(e)(1). A petitioner's good faith is presumed "in the absence of direct evidence of bad faith." *Grice v. Sec'y of Health & Human Servs.*, 36 Fed. Cl. 114, 121 (1996). Where no evidence of bad faith exists and respondent does not challenge petitioner's good faith, good faith requires no further analysis.

### A.   Reasonable Basis

#### 1.   Legal Standard

Reasonable basis is an objective inquiry, irrespective of counsel's conduct or looming statute of limitations, that evaluates the sufficiency of records available at the time a claim is filed. *Simmons v. Sec'y of Health & Hum. Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017); *see Turpin v. Sec'y of Health & Hum. Servs.*, No. 99-564, 2005 WL 1026714 at *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005). A special master's evaluation of reasonable basis focuses on the requirements for a petition under the Vaccine Act to determine if the elements have been asserted with sufficient objective evidence to make a feasible claim for recovery. *Santacroce v. Sec'y of Health & Hum. Servs.*, No. 15-555V, 2018 WL 405121 at *7 (Fed. Cl. 2018).

Reasonable basis is satisfied when there is a mere scintilla of objective evidence, such as medical records or medical opinions, supporting a feasible claim before filing. *See Cottingham ex. rel. K.C. v. Sec'y of Health & Hum. Servs.*, 971 F.3d 1337, 1346 (Fed. Cir. 2020); s*ee Chuisano v. Sec'y of Health & Hum. Servs.*, 116 Fed. Cl. 276, 286 (2014) (citing *McKellar v. Sec'y of Health & Hum. Servs.*, 101 Fed. Cl. 303, 303 (2011)); s*ee Silva v. Sec'y of Health & Hum. Servs.*, 108 Fed. Cl. 401, 405 (2012). A recent attempt to clarify what quantifies a scintilla looked to the Fourth Circuit, which characterized "more than a mere scintilla of evidence" as "evidence beyond speculation that provides a sufficient basis for a reasonable inference of causation." *Cottingham v. Sec'y of Health & Hum. Servs.,* 154 Fed. Cl. 790, 795 (2021) (quoting *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 765 (4th Cir. 2021)). Additionally, absence of an express medical opinion of causation is not necessarily dispositive of whether a claim has a reasonable basis. Medical records may support causation even where the records provide only circumstantial evidence of causation. *James-Cornelius*, 984 F.3d at 1379-80.

Evaluation of reasonable basis is limited to the objective evidence submitted. *Simmons*, 875 F.3d at 636. Still, a special master is not precluded from considering objective factors such as "the factual basis of the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa v. Sec'y of Health & Hum. Servs.*, 138 Fed. Cl. 282, 289 (2018). In *Cottingham*, the Federal Circuit expressly clarified that special masters are permitted to utilize a totality of the circumstances inquiry in evaluating reasonable basis, including, but not exclusively limited to, objective factors such as those identified in *Amankwaa. See Cottingham,* 971 F.3d at 1344. The Federal Circuit reiterated that counsel conduct is subjective evidence not to be considered when evaluating reasonable basis. *Id*. at 1345. Counsel's attempt or desire to obtain additional records before filing is subjective evidence and does not negate the objective sufficiency of evidence presented in support of a claim. *James-Cornelius,* 984 F.3d at 1381. The Federal Circuit has additionally articulated that special masters cannot broadly categorize all petitioner affidavits as subjective evidence or altogether refuse to consider petitioner's sworn statements in evaluating reasonable basis. *See James-Cornelius,* 984 F.3d at 1380 (holding that factual testimony, when corroborated by medical records and a package insert, can amount to relevant objective evidence for supporting causation). However, a petitioner's own statements cannot alone support reasonable basis, and special masters may make factual determinations as to the weight of evidence. *See, e.g., Chuisano*, 116 Fed. Cl. at 291; *Foster v. Sec'y of Health & Hum. Servs.*, No. 16-1714V, 2018 WL 774090, at *3 (Fed. Cl. Spec. Mstr. Jan. 2, 2018); *Cottingham*, 971 F.3d at 1347.

While absent or incomplete records do not strictly prohibit a finding of reasonable basis, an overwhelming lack of objective evidence will not support reasonable basis. *Chuisano*, 116 Fed. Cl. at 288; *see Simmons,* 875 F.3d at 634-36 (holding that reasonable basis was not satisfied where 1) petitioner's medical record lacked proof of vaccination and diagnosis and 2) petitioner disappeared for two years before filing a claim). The objective evidence in the record must also not be so contrary that a feasible claim is not possible. *Cottingham*, 154 Fed. Cl. at 795, citing *Randall v. Sec'y of Health & Hum. Servs.,* No. 18-448V, 2020 WL 7491210, at *12 (Fed. Cl. Spec. Mstr. Nov. 24, 2020) (finding no reasonable basis when petitioner alleged a SIRVA injury in his left arm though the medical records indicated that the vaccine was administered in petitioner's right arm). A claim may lose reasonable basis as it progresses if further evidence is unsupportive of petitioner's claim. *See R.K. v. Sec'y of Health & Hum. Servs.,* 760 F. App'x 1010, 1012 (Fed. Cir. 2019) (citing *Perreira v. Sec'y of Health & Hum. Servs.,* 33 F.3d 1375, 1376–77 (Fed. Cir. 1994)).

Though a special master has broad discretion, a special master must keep in mind the Vaccine Act's remedial objective of maintaining petitioners' access to willing and qualified legal assistance, and a special master may not abuse their discretion in denying reasonable basis and fees. *See James-Cornelius,* 984 F.3d at 1381.

### 2. Parties' Arguments

Respondent "contests that petitioner's claim was supported by a reasonable basis." Response at 11, ECF No. 57. Respondent submits that "it is unclear that petitioner actually has TM" and that petitioner "provided no objective evidence that her condition began within a medically acceptable timeframe following vaccination that would infer a causal relationship." *Id.*

15

Respondent acknowledges that petitioner's doctors associated her symptoms with possible TM three months after her October 4, 2016 vaccination and almost two years after her November 3, 2014 vaccination but submits that petitioner has not provided evidence that a vaccine can trigger TM within those timeframes. *Id.* at 11–12. Respondent argues that petitioner was not diagnosed with possible TM until January 2017, and there is no evidence to suggest that petitioner was "simply 'misdiagnosed' until 2017." *Id.* at 13. Respondent further submits that petitioner experienced symptoms allegedly caused by the vaccinations, such as facial numbness, vision loss, ataxia, and incontinence, before either vaccination. *Id.* at 12.

Petitioner filed a reply to respondent's November 20, 2020 response, addressing reasonable basis.[7] Petitioner acknowledges that her complicated pre-existing medical conditions, including those with symptoms in common with TM/NMO, "somewhat cloud[] the water and make[] it harder to see the connection between the vaccine and the TM/NMO." Reply at 1–2, 8; ECF No. 59. However, petitioner submits that "the *new* symptoms petitioner experienced after receiving the vaccines" form the reasonable basis for filing. *Id.* at 2, 8. Petitioner submits that she first began experiencing significant facial numbness within two weeks of her November 3, 2014 flu vaccine, followed by vision loss in August 2015, "both of which are recognized as symptoms of TM/NMO." *Id.* at 2, 9. Petitioner further submits that the symptoms following her October 4, 2016 flu vaccination: increased facial numbness and vision loss, sudden onset of oral numbness, difficulty swallowing, ataxia, and numbness in the groin and rectum, were caused by the 2016 vaccine and led to a TM/NMO diagnosis in 2017. *Id.* at 9.

Petitioner submits that there was reasonable basis for filing as one of her treating physicians, Dr. Crabtree, "expressed to Petitioner that she believed Petitioner's NMO was possibly caused by or aggravated by the flu vaccines" and because there is literature finding a risk of vaccination-associated relapses occurring up to 90 days after vaccination among untreated NMO patients. *Id.* at 10. Petitioner argues that even if she lacked reasonable basis for alleging her 2014 vaccine caused TM/NMO, there is reasonable basis for filing the claim based on her 2016 vaccination alone. *Id.*

### III. Analysis

Petitioner alleged that her flu vaccines on November 3, 2014 and October 4, 2016 caused her to suffer adverse effects, and after "an unfortunate case of misdiagnosis for several years…she was finally diagnosed with Transverse Myelitis (TM) on January 18, 2017." Pet. at 1. To establish reasonable basis for the filing of her claim, petitioner must provide some objective evidence of a connection between the administration of her flu vaccines and her injuries and corresponding symptoms.

---

[7] Petitioner filed a Motion for Attorney's Fees and Costs on September 24, 2019. Motion, ECF No. 53. Potential issues relating to attorney's fees and costs were not addressed. Petitioner did not file a reply to respondent's initial response, which deferred to the presiding Special Master as to whether good faith and reasonable basis were met. *See* Response, ECF No. 54.

### 1. Petitioner Lacked Reasonable Basis for Filing a Claim Based on her November 3, 2014 Flu Vaccination.

Petitioner argues that "the *new* symptoms petitioner experienced after receiving the vaccines" form the reasonable basis for her petition. Reply at 2, 8. However, review of petitioner's medical records reveal that the "new" symptoms petitioner claims to have experienced after receiving the November 3, 2014 vaccine were not in fact new. The symptoms which may have been new, such as the "vision loss" in August 2015 that she alleged to be vaccine-related, are too far removed in time from her 2014 vaccination. Pet. Ex. 9 at 48-49; Pet. Ex. 16 at 55-60; *see* Reply at 9. Furthermore, petitioner was not diagnosed with possible TM or NMO for nearly three years after her November 3, 2014 vaccination. I find no reasonable basis for filing a claim based on her November 3, 2014 flu vaccination.

#### a. Petitioner's Alleged "New" Symptoms Have No Reasonable Connection with Her Vaccinations.

Petitioner submits that she first began experiencing significant facial numbness within two weeks of her November 3, 2014 flu vaccine, followed by vision loss in August 2015, "both of which are recognized normal as symptoms of TM/NMO." Reply at 2, 9. These symptoms, according to petitioner, establish reasonable basis for her claim. *Id.* at 2. However, petitioner's facial numbness existed prior to receipt of her November 3, 2014 flu vaccination. *See* Pet. Ex. 5 at 71. When petitioner presented to Dr. McDermott on November 3, 2014, she reported facial numbness during her exam before administration of the vaccination. *Id.* Petitioner had previously reported facial and tongue tingling in November 2013, over a year prior to her 2014 vaccine. Pet. Ex. 30 at 3. She also had skin sensation disturbances in April 2014. Pet Ex. 12 at 77. At her March 30, 2015 visit with Dr. Khursheed, she reported six months of facial numbness, placing the onset of facial numbness two months prior to her November 3, 2014 vaccine. *See* Pet. Ex. 7 at 13. Petitioner's facial numbness preceded her November 3, 2014 flu vaccine and thus cannot support reasonable basis.

Petitioner's assertion that "vision loss" in August 2015 is supportive of reasonable basis is equally faulty. On August 24, 2015, petitioner had reported blurred/double vision, but her neurologist found normal visual fields for both eyes and no other eyesight concerns were noted. Pet. Ex. 9 at 48-49; Pet. Ex. 16 at 55-60. Further, the "vision loss" occurred over eight months after petitioner's November 3, 2014 vaccination. It would be unreasonable to believe that an occurrence over eight months after vaccination has any temporal or other connection to the vaccination. Petitioner's "vision loss" in August 2015 is so far removed in time that it cannot possibly support reasonable basis for the filing of her claim based on her November 3, 2014 vaccination.

Petitioner cannot establish reasonable basis for her claims associated with the 2014 flu vaccine based on symptoms that were already present at the time of vaccination or symptoms that appeared more than eight months after the vaccination.

#### b. Petitioner Was Not Diagnosed with Possible TM or NMO For Nearly Three Years After Her November 3, 2014 Flu Vaccination.

Petitioner's diagnoses of TM and NMO do not support reasonable basis. At the earliest, petitioner received a possible TM diagnosis in January 2017, placing her TM diagnosis nearly three years after her 2014 flu vaccine. Pet. Ex. 1 at 202-03. This eventual diagnosis was then questioned at her neurology follow-ups and the etiology was considered unclear. Pet. Ex. 1 at 43; Pet. Ex. 97-98. Regardless of whether the possible TM diagnosis in 2017 was accurate, it is unreasonable to connect petitioner's symptoms in January 2017 with a vaccine received more than two years prior.

Petitioner additionally alleges that she suffered from NMO because of her 2014 and/or 2016 flu vaccines, establishing reasonable basis for her claim. Reply at 1. However, petitioner's history of testing for NMO does not support a reasonable temporal connection to her vaccines. Petitioner specifically states that her NMO antibody test in January 2017 was negative. Pet. at ¶ 25; Pet. Ex. 1 at 203. She again tested negative for NMO antibodies in February 2017, when presenting with facial numbness, groin numbness, right eye blindness, teeth pain, and generalized weakness. Pet. Ex. 1 at 22. It was not until a lumbar puncture conducted on May 26, 2017 that petitioner tested positive for NMO antibodies. Pet. Ex. 24 at 36. The reason for the change in NMO antibody testing is unknown. *See id.* at 36–37. Regardless, the record clearly indicates that petitioner did not test positive for NMO antibodies for over two years following her November 3, 2014 flu vaccination. As with petitioner's TM diagnosis, it is flatly unreasonable to find a connection between petitioner's positive NMO antibody test in May 2017 with a vaccination nearly three years prior.

Special masters are permitted to utilize a totality of the circumstances inquiry in evaluating reasonable basis. *See Cottingham*, 971 F.3d at 1344–45; *Chuisano*, 116 Fed. Cl. at 288. Here, considering the totality of circumstances, petitioner's medical records reflect chronic medical issues prior to and/or too remote in time from the allegedly causal vaccines to establish a reasonable basis for her claims. Neither petitioner's alleged TM nor NMO diagnoses were within reasonable timeframes of her vaccination in 2014.

## 2. Petitioner Lacked Reasonable Basis for Filing a Claim Based on her October 4, 2016 Flu and/or Tdap Vaccinations.

Disregarding the 2014 vaccination, petitioner alleges that there is reasonable basis for filing her claim based on the October 4, 2016 vaccinations alone. Reply at 10. Petitioner submits that her increased facial numbness, sudden onset of ataxia, incontinence, and numbness in the groin and rectum were connected to her 2016 vaccine and led to her diagnosis of TM in January 2017. *Id.* at 9. However, petitioner noted these symptoms from her pre-existing and chronic conditions, which do not provide reasonable basis for a casual or significant aggravation claim. Pet. Ex. 9 at 9.

### a. Petitioner Suffered from Ongoing Neurological and Chronic Conditions for Years Prior to Her October 4, 2016 Vaccinations.

Petitioner argues that her symptoms of falling, headaches, vision disturbances, facial numbness, incontinence, paresis, and weakness were the result of her October 4, 2016 vaccines, yet these symptoms predated her October 4, 2016 vaccinations. Pet. Ex. 6 at 230, 233; Pet. Ex. 8 at 55; Pet. Ex. 9 at 8-10, 33. Further, petitioner's medical providers attributed several of these

symptoms to her chronic conditions and "mini-strokes." *See* Pet. Ex. 9 at 9.

Petitioner's history of falling dates back to 2013, prior to her receipt of any of the allegedly causal vaccines. In 2013, petitioner reported "falling a lot." Pet. Ex. 30 at 3. In July 2014, petitioner reported falling because she couldn't "feel the floor." Pet. Ex. 5 at 98. On the date of her November flu vaccine, November 3, 2014, she complained of having trouble walking because her legs were "like 'jelly.'" Pet. Ex. 5 at 70; Pet. Ex. 15 at 5. She was documented as having a slow, shuffling, antalgic gait. Pet. Ex. 5 at 71. On November 4, 2014, the day after her flu vaccine, she reported nine falls in the past year to her physical therapist. Pet. Ex. 12 at 20–31; Pet. Ex. 15 at 8; Pet. Ex. 9 at 8.

On July 25, 2016, three months prior to petitioner's October 4, 2016 vaccines, petitioner reported dizziness, double vision, vertigo, increased lethargy, bilateral hip pain, and lower back pain to her neurologist. Pet. Ex. 9 at 8. She further reported that after having streptococcal pharyngitis and pneumonia, she developed worsening headaches, left-sided paresis, numbness, slurred speech, incontinence, and numbness in her face, left arm, and leg. *Id.* She "apparently suffered a… stroke…." that "could be due to her obesity, hypothyroidism, and multiple other medical problems," including the petitioner's obstructive sleep apnea, which is also a risk factor for developing strokes. *Id.* at 9.

Petitioner's claim that the October 4, 2016 vaccines caused her falling, headaches, vision disturbances, facial numbness, incontinence, paresis, and weakness, is contradicted by her medical records that show continuous problems with these symptoms for several years.

### b. No Scintilla of Objective Evidence Connects Petitioner's October 4, 2016 Vaccinations to her TM or NMO or Any Aggravation of Such Conditions.

Petitioner ultimately relies on the records of a TM diagnosis and Dr. Crabtree's NMO diagnosis in November 2017 to support reasonable basis for her claim. However, as noted above, petitioner's diagnosis of possible TM was unconfirmed and subsequently thought to be inaccurate. Pet. Ex. 1 at 43; Pet. Ex. 97-98. Additionally, petitioner continued to test negative for NMO antibodies for several months after her 2016 vaccinations. Pet. Ex. 1 at 22, 203. She did not receive a NMO diagnosis until eleven months after her 2016 vaccinations. *See* Pet. Ex. 25 at 126. Petitioner's long-standing and oscillating symptoms of facial numbness, generalized weakness, and vision changes, were noted to be neurologic symptoms of unclear etiology. *See* Pet. Ex. 1 at 22; *see* Pet. Ex. 9 at 9. A neurologist had also considered whether petitioner's symptoms were psychogenic in origin. Pet. Ex. 7 at 16. Overall, based on the medical record and timelines, it would be unreasonable to connect petitioner's 2016 vaccinations to TM or NMO.

Though petitioner continued to report TM after her 2016 vaccinations at subsequent appointments, these reports were not grounded in fact[8] and do not provide support for reasonable basis. Prior to the filing of this matter, petitioner's TM diagnosis had already been found

---

[8] Even petitioner's history provided at the hospitalization that led to her initial differential TM diagnosis was incorrect. *See* Pet. Ex. 1 at 678. She reported being able to accomplish her ADLs without assistance, yet she had been using a cane for months, was living at an assisted living center, and had previously had strokes. These facts were not reported. *See* Pet. Ex. 5 at 19-22.

unsupported by two different medical professionals. Pet. Ex. 7 at 16; Pet. Ex. 13 at 95–107; *see also* Pet. Ex. 5 at 71–72; Pet. Ex. 1 at 21. While TM may have been included in differential diagnoses, none of petitioner's treating neurologists ultimately believed she suffered from TM, instead checking for other etiologies. *See* Pet. Ex. 13 at 98; Pet. Ex. 24 at 3–6. Therefore, petitioner's alleged TM does not provide reasonable basis for the filing of this claim.

Furthermore, petitioner did not obtain any NMO diagnosis or positive NMO antibody test *until after the filing of this matter*. Petitioner did not test positive for NMO antibodies until May 26, 2017, several weeks after this claim was filed on May 9, 2017. *See* Pet. Ex. 24 at 36. Then, several months after the claim had been filed – after a "stone cold normal" brain MRI, spinal MRI without abnormal signal intensity, and several months without care – petitioner presented to Dr. Crabtree on November 15, 2017. Pet. Ex. 13 at 97; Pet. Ex. 22 at 8; Pet. Ex. 23 at 4-5; Pet. Ex. 25 at 126. Based on the history provided by petitioner and a neurological examination, Dr. Crabtree assessed petitioner with NMO. Pet. Ex 25 at 126. Therefore, it was not until six months after the filing of this claim that petitioner received a NMO diagnosis. Based on the evidence available at the time of filing, Petitioner's NMO diagnosis could not have possibly formed the reasonable basis for filing her claim.

Though reasonable basis could theoretically be gained, such did not occur in this matter. On June 13, 2018, a year after the petition was filed, Dr. Crabtree wrote a letter attesting to her NMO diagnosis of petitioner and briefly referred to medical literature that would possibly support a significant aggravation relationship between petitioner's injuries and vaccinations. Reply Ex. A. The literature mentioned a risk of vaccination-associated relapses occurring up to ninety days after vaccination among untreated NMO patients. Reply Ex. C at 1. The literature found the highest association of NMO relapse to vaccines was within the first thirty days after vaccination. *Id.* at 4. Dr. Crabtree also opined that "it is possible that vaccines increased [petitioner's] relapse rate." Reply Ex. A.

While this presents a possible timeframe for an NMO relapse associated with vaccination, it does not support the timeframe alleged by petitioner, who claims that either the 2014 vaccination caused TM/NMO over two years later or the 2016 vaccinations triggered a TM/NMO event/"relapse" over 100 days[9] after her vaccinations. Dr. Crabtree admitted that she "cannot comfortably state with professional certainty that it is more probable than not that [petitioner's] NMO-SD was exacerbated due to receipt of a vaccine." Reply Ex. A. Moreover, the entirety of Dr. Crabtree's opinion on aggravation of petitioner's NMO is questionable, as petitioner did not test positive for NMO antibodies until May 2017, over seven months after her 2016 vaccinations. Pet. Ex. 24 at 36. Therefore, although there may be a scientific possibility of NMO relapse after vaccination, there is no reasonable connection here. Dr. Crabtree's records and letter do not provide support for a finding of reasonable basis during the pendency of the matter.

Petitioner concedes that her medical history both prior to and after her vaccines is complicated. Reply at 2, 8. Though she attempts to satisfy reasonable basis by pointing to "new" symptoms after each vaccination, she fails to substantiate her arguments with any evidence of new symptoms within a reasonable time after her vaccinations. Petitioner's symptoms were chronic,

---

[9] This is calculated using the January 18, 2017 hospitalization, which petitioner argues is when she had a sudden onset of symptoms leading to her diagnosis of TM/NMO. *See* Reply at 9; Pet. Ex. 1 at 678.

attributed to other comorbidities, and too remote in time to have any reasonable connection with either her 2014 or 2016 vaccinations.

### III. Conclusion

Having examined all the evidence on the record, I find petitioner has failed to present even a scintilla of evidence connecting her vaccines to her alleged injuries. Reasonable basis did not exist at the time of filing, nor was it gained at any point during the pendency of the case.

**Accordingly, petitioner's Motion for Attorneys' Fees and Costs is DENIED**. The Clerk of the Court is directed to enter judgment in accordance with this Decision.[10]

**IT IS SO ORDERED.**

<u>**s/ Mindy Michaels Roth**</u>
Mindy Michaels Roth
Special Master

---

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.